**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

JEANNE A. MCNABB,                          )
                                           )
                        Plaintiff,         )
                                           )
            v.                             )        No.  4:14-CV-380 NAB
                                           )
CAROLYN W. COLVIN, Acting                  )
Commissioner of Social Security,           )
                                           )
                        Defendant.         )

## MEMORANDUM AND ORDER

Plaintiff Jeanne A. McNabb brings this action under 42 U.S.C. §§ 405(g)

and 1383(c)(3) for judicial review of the Commissioner's final decision denying

her application for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401, *et seq.*, and application for supplemental security

income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters

are pending before the undersigned United States Magistrate Judge, with consent

of the parties, pursuant to 28 U.S.C. § 636(c).  Because the Commissioner's final

decision is not supported by substantial evidence on the record as a whole, it is

reversed.

### I.  Procedural History

On October 29, 2010, the Social Security Administration denied plaintiff's

applications for DIB and SSI in which she claimed she became disabled on July 14, 2010, because of depression, anxiety, and amputation of her left arm. (Tr. 78-79, 81-85, 136-48, 164.)[1] Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on March 7, 2012, at which plaintiff and a vocational expert testified. (Tr. 25-71.) On October 16, 2012, the ALJ issued a decision denying plaintiff's claims for benefits, finding vocational expert testimony to support a finding that plaintiff was able to perform work as it exists in significant numbers in the national economy, and specifically, as a furniture rental consultant. (Tr. 10-20.) The Appeals Council denied plaintiff's request for review of the ALJ's decision on February 3, 2014. (Tr. 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that ALJ erred in determining her residual functional capacity (RFC) by finding that her prosthetic left arm could act as a "helper" in performing work-related activities. Plaintiff also argues that the ALJ erred in according little weight to the opinion of the consulting psychologist, Dr. Moore. Plaintiff further contends that the ALJ failed to fully and fairly develop the record by not admitting

---

[1] Plaintiff's applications for DIB and SSI are dated August 5, 2010, and January 7, 2011, respectively. In his decision, the ALJ considered both applications to be protectively filed as of July 20, 2010. (Tr. 10.)

- 2 -

evidence of video surveillance recorded by an investigator for the Social Security Administration's Cooperative Disability Investigations (CDI) Unit and that the ALJ wrongfully considered only that portion of the investigator's written report that supported a finding of non-disability. Finally, plaintiff contends that the ALJ improperly characterized the vocational expert's testimony and erred by relying on such testimony to support a finding of non-disability. Plaintiff requests that the final decision be reversed and that she be awarded benefits, or that the matter be remanded for further consideration. For the reasons that follow, the matter will be remanded for further proceedings.

## II. Testimonial Evidence Before the ALJ

A.      Plaintiff's Testimony

At the hearing on March 7, 2012, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-nine years of age. Plaintiff stands five feet, three inches tall and weighs 225 pounds. Plaintiff is right-handed. Plaintiff is not married. She has two children, ages eleven and thirty-one, and lives in a house with her eleven-year-old daughter. Plaintiff left school when she was in ninth grade. (Tr. 31-32, 43.) Plaintiff took classes in math and reading for a couple of months in 2009 and 2010. (Tr. 53.) She can read to a degree, perform simple math, and make change, but is not good at spelling. (Tr. 43-44.) She

currently receives Medicaid assistance.  (Tr. 42.)

Plaintiff's Work History Report shows that plaintiff was an owner/operator of a restaurant from 1986 to 1998.  Plaintiff then worked as a dietary manager at a hospital from 1999 to December 2000.  From 2002 to 2007, plaintiff worked as a cashier at a gas station.  In 2003 and 2004, plaintiff also worked at Subway and in the office at TruckPro.  In 2005 and 2006, plaintiff worked at Six Flags Amusement Park.  In 2007 and 2008, plaintiff worked at Pretzel Time, a restaurant. Plaintiff also worked at a gas station in 2008.  In 2009, plaintiff worked at Burger King.  In 2009 and 2010, plaintiff worked in the kitchen at a nursing home.  (Tr. 175-85.)  Plaintiff testified that she also worked in 2008 performing temporary work at Monsanto, collating and putting books together.  (Tr. 40.)

Plaintiff testified that she was involved in a car accident in July 2010 causing injury to her left arm that resulted in amputation.  Plaintiff has a prosthetic arm that has a cosmetic hand that stays in one position and cannot be manipulated. Plaintiff received a CD for instruction on how to use the arm.  Plaintiff testified that she does not wear the prosthesis because of pain and that she has worn it for a total of about two hours.  Plaintiff testified that in order to wear the prosthesis, she must place her arm in it as far as it can go.  Plaintiff testified that she cannot place her arm all the way into the prosthesis because of the pain she experiences when her stump touches the bottom, which then causes the prosthetic arm to fall off.

Plaintiff testified that she was recently prescribed medication for the pain but had an allergic reaction to it. Plaintiff testified that no alternative medication has yet been prescribed. Plaintiff testified that her doctors do not give her pain medication because of her underlying issue with depression. (Tr. 30-31, 42, 45-47, 52, 62.)

Plaintiff testified that she also injured her neck in the accident, and the ALJ observed plaintiff to be limited in turning her neck toward her shoulder. Plaintiff testified that her lower back was also injured in the accident and that she sometimes cannot stand up straight. (Tr. 42, 44.)

Plaintiff testified that she has suffered from depression and agoraphobia most of her life and that her depression worsened after having her last child. (Tr. 33, 37.) Plaintiff testified that her depression used to come and go but has not gone away since the accident in 2010. Plaintiff testified that she experiences fatigue and has problems with her memory and concentration. She is constantly stressed, feels sad all the time, and has inconsistent sleep patterns. (Tr. 54-58.) Plaintiff has been seeing a psychiatrist for eight years and currently takes Pristiq, Ativan, and Adderall. She experiences tiredness and headaches as side effects from her medication. Plaintiff testified that her psychiatrist changes her medications from time to time in order to get a better effect. Plaintiff testified that although she previously worked with depression, none of her jobs lasted that long. (Tr. 45-47.)

As to her exertional abilities, plaintiff testified that her lower back condition limits her walking to about ten minutes.  She can stand for twenty minutes. Plaintiff testified that she has no difficulty with sitting or lying in bed.  Plaintiff later testified that she can sit for twenty to thirty minutes at one time and then must take a break from sitting because of her right leg and back.  Plaintiff testified that she does not lift many things because she has poor balance without her left arm. The ALJ observed plaintiff to lift a pocketbook and Kleenex.  Plaintiff testified that her daughter carries the grocery bags.  (Tr. 50-51, 54.)

As to her daily activities, plaintiff testified that she gets up in the morning, turns on the television, and eats a bowl of cereal.  Plaintiff testified that she waits for her daughter to come home, after which they eat and then go to bed.  (Tr. 55.) Plaintiff can prepare microwavable meals.  She uses a dishwasher to wash the dishes.  Plaintiff does laundry with her daughter's help.  Plaintiff testified that her daughter helps a lot.  Plaintiff goes to the grocery store with her daughter.  (Tr. 49-50.)  Plaintiff testified that she has difficulty getting dressed and no longer wears underwear because she can't pull them up.  Plaintiff tries to wear shorts if she can. Plaintiff testified that it takes her two hours to bathe and get dressed every day. Plaintiff testified that she has a driver's license and continues to drive.  She leaves the house only when she has to for groceries and doctors' appointments.  Plaintiff has no hobbies.  (Tr. 48, 55-57.)

B.      Testimony of Vocational Expert

Robin Cook, a vocational consultant, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Cook classified plaintiff's past work as a food order expediter at a full restaurant, cashier/checker, fast food worker, and collator operator as light and semi-skilled.  (Tr. 60-61.)

The ALJ asked Ms. Cook to assume an individual with plaintiff's training, education, and work experience and to further assume that she could perform light work.  (Tr. 62.)  The ALJ asked Ms. Cook to assume the person to have the following limitations:

> Climb ropes, ladders, scaffolds never; crawl never.  This individual does not have a left arm.  So we have a left arm amputee above the elbow.  However, there is a prosthetic arm that could be used as a helper but not in grasping or anything.  It could be used as a balancing. [sic]

(Tr. 63.)  Ms. Cook testified that such a person could not perform any of plaintiff's past work or any other work in the national economy.  Ms. Cook explained, "The only things that I have that would comply to your hypothetical are things like usher, which typically presents as a part-time job versus the full-time competitive work, and order caller, which really is not performed in the same way now.  It's usually more computerized."  (*Id.*)  Ms. Cook further testified that there likewise was no sedentary work for such a person to perform inasmuch as sedentary work

typically requires good use of both arms.  (Tr. 63.)

The ALJ noted that the State had identified the job of furniture rental consultant and asked Ms. Cook if such a job was available for a person as described in the hypothetical.  Ms. Cook testified that such a job would not be available "on a one-arm" basis inasmuch as the job requires occasional reaching, handling, and fingering as described in the *Dictionary of Occupational Titles.*  (Tr. 64.)  Upon clarification that the person retained the use of her dominant arm, Ms. Cook testified that such a job could be performed full-time by someone as described in the hypothetical.  Ms. Cook testified that 2,745 such jobs exist in the State of Missouri and 157,485 nationally.  (Tr. 66.)

Counsel then asked Ms. Cook to consider the same individual but that she also had no ability to behave in an emotionally stable manner.  Ms. Cook testified that there were no jobs that such a person could perform.  (Tr. 67.)

The ALJ asked Ms. Cook to consider another hypothetical individual with the same limitations as set out in the first hypothetical, but who was also limited to understanding, remembering, and carrying out at least simple instructions and non-detailed tasks; could demonstrate adequate judgment to make simple work-related decisions; could adapt to routine, simple work changes; and "can't perform work at a normal pace without production quotas. "  (Tr. 68.)  Ms. Cook testified that such a person could continue to perform the work of furniture rental consultant.  (*Id.*)

Ms. Cook testified that her testimony was consistent with the *Dictionary of Occupational Titles* except where she explained the differences.  (Tr. 68.)

### III.  Medical Evidence Before the ALJ

On August 31, 2009, plaintiff visited Dr. William Irvin, Jr., for psychotherapy and medication management for panic disorder.  Plaintiff reported being "okay" and that her mood was "okay."  Plaintiff reported having some anxiety.  It was noted that plaintiff was having some conflict with her mother.  Mental status examination showed plaintiff to be well dressed and groomed, to have regular rate and rhythm of speech, and to have logical and sequential flow of thought with no evidence of psychosis or homicidal or suicidal ideations.  Plaintiff's affect was noted to be euthymic.  Plaintiff was continued on her medications, which included Adderall, Klonopin, and Pristiq.  Triavil was added to plaintiff's medication regimen.  (Tr. 296.)

Plaintiff returned to Dr. Irvin on November 12, 2009, and reported that her mood was good.  It was noted that plaintiff was going to school, was doing well with her writing, and enjoyed it.  Plaintiff had no complaints regarding her sleep or appetite.  Mental status examination was unchanged from the last visit.  Plaintiff reported being mildly sleepy as a side effect of her medication.  Plaintiff was instructed to continue with her medications.  (Tr. 295.)

On February 12, 2010, plaintiff reported to Dr. Irvin that her mood was

better and that she was excited about her classes. Mental status remained unchanged. Dr. Irvin determined plaintiff to be stable. Plaintiff was continued on her medications. (Tr. 294.) On May 12, plaintiff reported that she was doing well and feeling good and that her classes had finished because the semester ended. Plaintiff's mental status examination was normal in all respects. Plaintiff was continued on Adderall, Klonopin, and Pristiq. (Tr. 293.)

Plaintiff was admitted to St. John's Mercy Medical Center on July 14, 2010, after being involved in a motor vehicle rollover accident that resulted in her left arm being mangled. Plaintiff underwent amputation of the left arm above the elbow with placement of a wound vac, after which she developed a postoperative MRSA infection.[2] CT scans of the head, neck, spine, abdomen, chest, and pelvis were normal. During her hospitalization, plaintiff's past medical history was noted to include chronic obstructive pulmonary disease, bipolar disorder, and possible congestive heart failure as reported by her family. Postoperatively, plaintiff reported having occasional pain about the wound area but no significant increase in pain. Upon consultation with a psychologist on July 23, plaintiff reported that she was coping as well as could be expected and demonstrated an interest in obtaining psychological services upon discharge from the hospital. Plaintiff was discharged

---

[2] MRSA stands for methicillin-resistant Staphylococcus infection. It causes a staph infection that is resistant to several common antibiotics. *Medline Plus* (last updated Jan. 8, 2015)<http://www.nlm.nih.gov/medlineplus/mrsa.html>.

on July 30 and was instructed to engage in no lifting, driving, or strenuous exercise until she was cleared by the trauma department. Plaintiff was instructed to follow up in two weeks. (Tr. 255-80.)

Plaintiff visited Dr. Anil K. Srivastava on August 4, 2010, for follow up. Plaintiff complained of having pain in her left arm and shoulder. It was noted that plaintiff was taking Oxycodone every four hours for pain and that the medication controlled her pain. It was also noted that plaintiff was on antibiotic therapy for MRSA. Plaintiff requested home health aide visits to help her with bathing and other things. Plaintiff's medications were noted to include Ativan, Colace, Bactroban, Hibiclens, Bactrim, Pristiq, Adderall, Roxicodone, and Klonopin. Plaintiff was instructed to discontinue Klonopin. Her prescription for Roxicodone was refilled. Plaintiff was continued with the wound vac. (Tr. 283-89.)

On August 5, 2010, plaintiff visited Dr. Irvin who noted plaintiff's recent accident and amputated left arm. Plaintiff reported doing fairly well but that she had been having anxiety attacks since the accident. Plaintiff reported feeling more depressed. Mental status examination showed plaintiff to be well dressed and groomed. Plaintiff's flow of thought was logical and sequential. Plaintiff had a dysthymic affect. Plaintiff also reported having some nightmares and flashbacks. Dr. Irvin noted these to be symptoms of posttraumatic stress disorder (PTSD). Dr. Irvin diagnosed plaintiff with panic disorder and major depressive disorder and

prescribed Pristiq, Adderall, Lexapro, and Ativan. Plaintiff was instructed to return in one month. (Tr. 291.)

Plaintiff visited her primary care physician, Dr. Tulika Katyal, on September 1, 2010, with complaints related to a urinary tract infection. Dr. Katyal noted plaintiff's recent amputation. Physical examination was unremarkable, which included examination of the back that showed no tenderness and intact range of motion. (Tr. 363.)

On September 2, 2010, plaintiff returned to St. John's and visited Dr. Bryan R. Troop for follow up. Plaintiff continued to have an open wound on her left arm with the wound vac. It was noted that the wound vac was changed three times a week by home health care and that plaintiff was scheduled for a skin graft the following week. Plaintiff reported having continued pain in her left arm with a sensation that she can feel her fingers and fist. Plaintiff also reported having pain in her shoulder. Plaintiff had run out of Oxycodone. Plaintiff reported that she went to Urgent Care on August 31 for pain and was given Percocet, which had since likewise run out. Plaintiff's prescription for Oxycodone was refilled. (Tr. 304-07.)

Plaintiff underwent a skin graft on September 9, 2010, at which time skin was removed from plaintiff's left thigh and grafted to the left arm with placement of a wound vac. (Tr. 308-10.) During follow up with Dr. Srivastava on September

14, plaintiff reported having phantom pain in her left arm and that she was experiencing very high anxiety. Plaintiff reported that taking Ativan for anxiety did not help. Plaintiff also reported that taking Oxycodone for pain likewise did not help and that she went to Urgent Care the previous day and was given Percocet. Dr. Srivastava noted the skin graft to have taken. The wound vac was discontinued, and plaintiff was prescribed an antibiotic cream and Percocet. (Tr. 319-22.)

Plaintiff visited Dr. Troop on September 21 for follow up. Plaintiff had good range of motion about the shoulder without pain. Plaintiff reported that she continued to have the sensation that she could feel her fist. Plaintiff also reported that she continued to have a lot of anxiety and that Ativan did not help. Plaintiff continued to take Percocet for pain. (Tr. 326-28.)

On October 1, 2010, plaintiff reported to Dr. Srivastava that she continued to have phantom pain and that she could not pick up anything with her arm because of pain and swelling. Plaintiff also reported having periods of anxiety. Plaintiff's prescription for Percocet was refilled. Plaintiff was also referred for prosthetic placement evaluation. (Tr. 330-33.)

On October 21, 2010, plaintiff visited Dr. Lisa K. Cannada at St. John's Department of Orthopaedic Surgery for consultation regarding prosthesis. Dr. Cannada noted plaintiff to have excellent range of motion about the shoulder.

Plaintiff complained of phantom pain. Examination showed plaintiff to be anxious but in no acute distress. The stump was noted to be well-healed but nevertheless to have quite a bit of swelling and soft tissue edema. Plaintiff was given a prescription for a stump shrinker as well as prescriptions for Neurontin and Elavil for phantom pain. (Tr. 388-89.)

On October 22, 2010, Marshal Toll, Psy.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which she opined that plaintiff's mental impairment was not severe. Dr. Toll specifically opined that plaintiff's major depressive disorder and anxiety caused only mild limitations in activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, or pace; with no repeated episodes of decompensation of extended duration. (Tr. 334-44.)

On November 16, 2010, plaintiff reported to Dr. Irvin that she was okay, but Dr. Irvin noted plaintiff to be tearful and really stressed. Plaintiff denied suicidal ideation. Dr. Irvin noted that plaintiff needed to stay on her treatment regimen and instructed plaintiff to take Pristiq, Adderall, Lexapro, and Ativan. (Tr. 495.)

Plaintiff returned to Dr. Cannada on November 18, 2010, and reported having difficulty coping with her new life as an amputee as well as difficulty coping with the phantom pain. Plaintiff reported that she stopped taking her previously prescribed medication because it caused gastrointestinal upset. It was

noted that plaintiff was to be fitted with a prosthetic arm that day and would be written a prescription for related physical therapy. (Tr. 386-87.)

Plaintiff returned to Dr. Cannada on February 10, 2011, who noted plaintiff to be very tearful. Plaintiff had been fitted with a prosthetic arm but did not like to wear it. It was noted that plaintiff had difficulty with the large harness because of her large breast size. Plaintiff was referred to Plastic Surgery for consideration of breast reduction surgery to assist with wearing the prosthesis and its harness. Plaintiff also complained of ongoing discomfort in the distal portion of her stump with significant phantom limb pain. Examination showed full range of motion but hypersensitivity at the most distal portion of the stump. Plaintiff was referred to Pain Management Services to assist with chronic pain. Plaintiff was also given information relating to PTSD. It was recommended that plaintiff seek specific help and treatment for PTSD; and plaintiff was encouraged to increase her level of counseling, which was presently at one session per week. (Tr. 384-85.) Plaintiff was instructed to continue with Pristiq and Ativan. (Tr. 482.) An x-ray taken of the left arm that same date showed a bone spur on the inferior aspect of the humerus distally. (Tr. 390.)

On February 15, 2011, plaintiff reported to Dr. Irvin that she was taking Neurontin but that it made her feel stressed. Plaintiff reported that she continued to have some ups and downs with her mood but was much better with her kids and

grandkids.  Plaintiff was noted to have a calm affect.  Mental status examination was unremarkable.  Plaintiff was continued on her medications.  (Tr. 493.)

On April 13, 2011, plaintiff reported to Dr. Irvin that she was doing okay and enjoyed spring.  Plaintiff's mood was noted to be good and her affect euthymic.  Plaintiff denied any suicidal ideation.  Plaintiff was continued on her medications and was instructed to return in three months.  (Tr. 492.)

Plaintiff returned to Dr. Cannada on May 5, 2011, who noted plaintiff to be very angry, tearful, and hostile toward the staff.  "She feels very upset that her life had indeed been saved by surgeons and she feels as if she has extremely dismal outlook on her life at this time.  She sees no point in living."  (Tr. 382.)  Plaintiff reported no change in her symptoms, and she continued to experience significant phantom limb pain.  Plaintiff reported that she visited Plastic Surgery as recommended, but she did not want to proceed with additional surgery.  Plaintiff also reported that she contacted Pain Management Services as instructed but was told that they were not accepting new patients.  Physical examination showed full range of motion and some hypersensitivity to the most distal portion of the stump.  Because of concern that she may be of harm to herself, plaintiff was advised to go to the emergency room to undergo a psychiatric evaluation.  Dr. Cannada noted that plaintiff was "clearly having some difficulties in dealing with life at this time . . . . It is clear that [she] is suffering from some form of posttraumatic stress

disorder[.]" (*Id.*)  Plaintiff left the clinic abruptly and declined all offers of help and intervention.  (Tr. 382-83.)

Plaintiff visited Dr. Irvin on August 1, 2011, and reported having arm pain but that Neurontin helped.  Overall, Dr. Irvin noted plaintiff's mood to be good. Mental status examination was unremarkable, and plaintiff exhibited a euthymic affect.  Plaintiff reported having good sleep and appetite.  Plaintiff had no suicidal ideations.  Plaintiff was continued on her medications.  (Tr. 490.)

On September 20, 2011, plaintiff reported to Dr. Irvin that she was getting a bit depressed.  Dr. Irvin noted plaintiff to have a calm affect.  Mental status examination was otherwise unremarkable, and plaintiff was continued on her medications.  (Tr. 489.)

Plaintiff returned to Dr. Cannada on September 29, 2011, and reported having a burning sensation about the left arm.  Plaintiff requested referral to a pain specialist.  Plaintiff was noted to be wearing her prosthesis and to be in no acute distress.  Examination was unremarkable.  Plaintiff was prescribed Neurontin. Finding that referral to a pain specialist would be inappropriate for neuropathic pain, Dr. Cannada referred plaintiff to a neurologist.  (Tr. 381-82.)

On October 31, 2011, Dr. Irvin added Celexa to plaintiff's medication regimen.  (Tr. 488.)

Plaintiff returned to Dr. Irvin on January 30, 2012, and reported feeling

"great."  Plaintiff was euthymic, and mental status examination was unremarkable. Plaintiff was continued on her medications.  (Tr. 487.)

Plaintiff visited Dr. Stanley J. Iyadurai, a neurologist at SLU-Care, on January 31, 2012, with complaints of pain.  Plaintiff was diagnosed with phantom limb pain, cervical radiculopathy, and carpal tunnel syndrome.  Plaintiff was prescribed Lyrica and Tegretol, and diagnostic studies were ordered.  (Tr. 513-15.)

On April 4, 2012, plaintiff underwent a consultative psychological evaluation for disability determinations.  Plaintiff reported being in significant pain with phantom pain in the left arm and pain in her low back and shoulders.  Plaintiff reported staying in bed all of the time because of pain and that she wakes constantly during her sleep cycle because of pain.  Plaintiff reported her pain to be at a level eight to ten on a scale of one to ten.  Plaintiff reported that she had a prosthetic arm but did not use it.  Plaintiff reported having depression since age nineteen and currently reported symptoms of depression, anxiety, and agoraphobia. Plaintiff reported that she was not employable because of severe depression and pain.  Plaintiff reported her mood to be at a level eight on a scale of one to ten, with ten being the most dysthymic.  Lloyd Irwin Moore, Ph.D., noted plaintiff's current medications to be Pristiq, Citalopram, and Ativan.  Plaintiff was noted to be cooperative.  Mental status examination showed plaintiff to look older than her stated age, to be clean but in disarray, and to look extremely haggard with circles

under her eyes. Plaintiff's mood was very dysthymic, and her affect was blunted and at times quite labile. Plaintiff reported having continuous suicidal ideation but no intent. Dr. Moore noted plaintiff to wear a large pouch to hide her amputated left arm. Plaintiff was calm, but she constantly repositioned herself because she could not get comfortable. Dr. Moore noted plaintiff's thought processes to be intact. Plaintiff was oriented times three, and her memory and general fund of knowledge were intact. Plaintiff's performance of simple calculations was fair. Dr. Moore considered plaintiff's judgment to be good and her insight to be fair to good. Dr. Moore diagnosed plaintiff with major depressive disorder, anxiety disorder, and panic disorder with agoraphobia. Dr. Moore assigned a Global Assessment of Functioning (GAF) score of 50.[3] Dr. Moore opined that plaintiff was moderately limited in her activities of daily living, noting that she had significant difficulties but was able to manage at some level. Dr. Moore opined that plaintiff was markedly limited in social functioning, noting that plaintiff did not like to interact with others and becomes very nervous and panicky when she is around others. With respect to concentration, persistence, and pace, Dr. Moore opined that plaintiff was markedly limited, noting that plaintiff had significant

---

[3] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. 2000, Text Revision). A GAF score between 41 and 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

difficulties because of her pain levels and mental status. (Tr. 518-22.)

In a Mental Medical Source Statement of Ability to Do Work-Related Activities completed that same date, Dr. Moore opined that plaintiff was moderately limited in her ability to understand, remember, and carry out simple instructions and in her ability to make judgments on simple work-related decisions. Dr. Moore further opined that plaintiff was markedly limited in her ability to understand, remember, and carry out complex instructions and in her ability to make judgments on complex work-related decisions. With respect to interaction, Dr. Moore opined that plaintiff was moderately limited in her ability to interact appropriately with supervisors and coworkers, but markedly limited in her ability to interact appropriately with the public. Dr. Moore further opined that plaintiff was markedly limited in her ability to respond appropriately to usual work situations and to changes in a routine work setting. Dr. Moore reported that plaintiff experienced these limitations for greater than fifteen years. (Tr. 523-25.)

On April 4, 2012, plaintiff underwent a consultative physical examination for disability determinations. Plaintiff reported to Dr. Alan H. Morris that she had pain in the left upper extremity, including phantom pain and pain in the left trapezius. Plaintiff reported that she had also been advised that she had carpal tunnel syndrome of the right hand, although Dr. Morris noted plaintiff not to have any symptoms in the right hand or wrist. Plaintiff reported that several

medications previously prescribed caused side effects. Plaintiff reported having had a prosthetic arm for about a year but that she did not wear it because of pain. Plaintiff reported that she can lift fifteen pounds with her right upper extremity. Plaintiff reported that she also has had neck pain and right hip pain since the accident and that the pain limits her sitting to twenty minutes, standing to twenty minutes, and walking to ten minutes. Plaintiff reported spending all day in bed. Plaintiff reported that she does no housekeeping chores and that her daughter helps her with dressing and bathing. Plaintiff drives and goes with her daughter to shop, but the daughter does all of the lifting and carrying. Plaintiff reported that she is able to use her right hand for fine activities, such as picking up keys, coins, and eating utensils. Dr. Morris noted plaintiff's medications to be Pristiq and Citalopram. Physical examination showed plaintiff able to walk about fifty feet with no limp. Plaintiff could toe walk, heel walk, and tandem gait. She could squat to forty degrees bilateral knee flexion. Plaintiff was able to rise from a chair and get on and off of the examination table independently. Tenderness was noted to palpation over the left distal humerus at the end of the stump. Examination of the right upper extremity was unremarkable. Plaintiff had full grip strength of the right hand. Plaintiff had limited range of motion about the knees and hips, bilaterally. Plaintiff had limited range of motion about the cervical and lumbar spines. Dr. Morris diagnosed plaintiff with left upper extremity amputation with

phantom pain.  (Tr. 528-30, 537-38.)

In a Physical Medical Source Statement of Ability to Do Work-Related Activities completed that same date, Dr. Morris opined that, with her right arm only, plaintiff could frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty pounds.  Dr. Morris further opined that plaintiff could sit and stand for twenty minutes at one time and could walk for ten minutes at one time.  Dr. Morris opined that plaintiff could sit for a total of two hours in an eight-hour workday, stand for a total of two hours in an eight-hour workday, and walk for a total of one hour in an eight-hour workday.  Dr. Morris further opined that plaintiff could frequently use her right hand for reaching, handling, fingering, feeling, pushing, and pulling and could frequently operate foot controls with both feet.  Dr. Morris opined that plaintiff should never climb ladders or scaffolds, stoop, crouch, or crawl; and could occasionally balance, kneel, and climb stairs and ramps.  Dr. Morris further opined that plaintiff could occasionally operate a motor vehicle but should never be exposed to unprotected heights or moving mechanical parts.  Finally, Dr. Morris opined that plaintiff could perform activities like shopping and could travel without a companion for assistance, ambulate without assistive devices, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed herself, and care for her

personal hygiene.  Dr. Morris opined that plaintiff could not sort, handle, or use paper or files.  (Tr. 531-36.)

## IV.  Report of CDI Unit Investigation

Upon request for investigation into plaintiff's activities and functioning in relation to her application for disability, Detective Mark Grobelny of the CDI Unit conducted a surveillance of plaintiff on April 4, 2012, as she travelled to and from her consultative examinations.  A surveillance video was made in relation to this investigation.  Detective Grobelny observed plaintiff to leave her home carrying papers and a small purse in her right hand and to manipulate the car door with her right hand, both with opening and closing.  Plaintiff drove to the examination site and was observed to walk from her vehicle with full, even strides and a steady gait and to briefly climb a steeply sloping cement ramp for several steps.  Detective Grobelny observed plaintiff walk a total of nearly 200 feet, half of which ascended a gradual slope.  Plaintiff was observed to be carrying items against the right side of her body, including an envelope, a purse, and a long slender item thought to be her prosthetic arm.  Once inside the building, plaintiff appeared to be lost, upset, and confused.  Detective Grobelny observed plaintiff to be breathing heavily. Plaintiff articulated that she was hot, and Detective Grobelny observed her to wipe her face and brow and to lift the hair off the back of her neck.  Plaintiff was able to communicate effectively with a nurse who provided plaintiff with some water and

a wheelchair.  When plaintiff left the examination site about two hours later, Detective Grobelny observed plaintiff descend the steps of the building without any apparent difficulty.  Plaintiff descended at a steady pace without use of the hand rail, although she was observed to carefully place her steps.  Plaintiff walked to her vehicle with even strides and a smooth, steady gait.  Plaintiff again manipulated the car door with her right hand while holding the items previously observed.  (Tr. 238-46.)

On April 19, 2012, Detective Grobelny and Detective Paul Neske visited plaintiff at her home.  Plaintiff was observed to be wearing a protective sock over the stump of her left arm.  Plaintiff reported that she continues to feel phantom pain in the arm and regularly feels an odd sensation of burning heat that spreads from the arm to the rest of her body.  Plaintiff reported keeping the house cool because of this heat sensation.  Plaintiff reported having difficulty grooming, getting dressed, and performing basic tasks.  It was noted, however, that plaintiff could do basic chores, use a computer, operate a telephone, drive, and read for leisure.  Plaintiff reported that, while she is able to live alone, everything she does now takes extra time and effort, which leads to occasional exhaustion.  Plaintiff also reported experiencing bouts of depression because of constant pain and disappointment in her appearance.  Plaintiff reported going out only when she has to because she does not like people staring at her.  She reported that working and

attending classes to obtain her GED have not been possible since the accident.

Plaintiff reported that she had a prosthetic "helper" arm but did not wear it much

because it occasionally causes pain.  Plaintiff reported the arm not to have a

functioning hand and to require manual manipulation with the other arm to

articulate it at the elbow, which was inconvenient.  (Tr. 238-46.)

Detective Grobelny concluded his report:

Based on my observations, Ms. McNabb did not appear to have any
difficulty sitting, standing or walking.  She avoided climbing the stairs
at the doctor's office, electing to walk an extended distance up slope,
but descended the stairs without any apparent difficulty or the use of
either handrail when returning to her vehicle.  She demonstrated an
ability to reach with her right arm and appears to have full dexterity in
her right hand.  She was observed carrying multiple objects on several
occasions, including her prosthetic arm.  She never appeared to be
suffering any obvious physical pain or discomfort, but was observed
experiencing a moment of anxiety and confusion inside the MedEx
building, when she was apparently having difficulty finding the
doctor's office.  I later learned she was afraid to use the elevator.
Though somewhat emotional, she was still able to maintain her
composure and communicate effectively with the nurse assisting her.
She is also clearly capable of operating a motor vehicle.  During my
interview with Ms. McNabb, she was very pleasant and
accommodating.  Based on her statements, she is capable of living
alone and performing basic tasks, though they now take longer and
physically exhaust her at times.  She stated she still experiences some
pain related to her accident and suffers emotionally from the physical
impact it has had on her.  She wept while explaining how the accident
has affected and changed her life.  Though she possesses a prosthetic
arm, she stated she does not wear it often because it is usually
inconvenient and sometimes painful.  She was not wearing it on the
two dates I observed her.

(Tr. 243.)

# V.  The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through March 31, 2011.  The ALJ found that plaintiff had not engaged in substantial gainful activity since July 14, 2010, the alleged onset date of disability.  The ALJ found plaintiff's left arm amputation, obesity, major depressive disorder, and anxiety disorder to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-14.)  The ALJ found plaintiff to have the RFC to perform light work[4] except that she

> can never climb ropes, ladders, or scaffolds; she can never crawl; she does not have a left arm but does have a prosthetic arm that can be used as a "helper"; she can understand, remember, and carry out at least simple instructions and non-detailed tasks; she can demonstrate adequate judgment to make simple work-related decisions; she can adapt to routine, simple work changes; and she can perform work at a normal pace without production quotas.

(Tr. 15.)  The ALJ found plaintiff unable to perform any of her past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work existing in significant numbers in the national economy, and

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b), 416.967(b).

specifically, furniture rental consultant.  The ALJ thus found that plaintiff was not under a disability from July 14, 2010, through the date of the decision.  (Tr. 18-20.)

## VI.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is

working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)

(internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

In this cause, the ALJ determined plaintiff not to be disabled by relying on vocational expert testimony that a person of plaintiff's age and with plaintiff's education, work experience, and RFC could perform work as a furniture rental consultant. In providing this testimony, the vocational expert considered that the person retained the use of her dominant right arm, had a prosthetic for the amputated left arm, and that the prosthetic could be used as a "helper" for balance but not for grasping. There is no evidence in the record, however, to support the conclusion that plaintiff is able to use her prosthetic arm as a "helper" arm to assist with balance or any other function. The ALJ's inclusion of this finding in his RFC and in the hypothetical question to the vocational expert is contrary to the facts of record and cannot stand. *See Ledoux v. Schweiker*, 732 F.2d 1385, 1388 (8th Cir. 1984).

In his written decision, the ALJ acknowledged that plaintiff had ongoing limitations as a result of her amputation but found that she had generally "done

well" following the skin graft in September 2010.  The ALJ also acknowledged that plaintiff experienced some nerve pain and phantom limb pain but found it to be controlled with medication.  Finally, the ALJ acknowledged plaintiff's complaints of pain relating to wearing the prosthetic arm, but found the medical records not to "reflect any complaints by the claimant regarding this prosthesis or any observations by her treatment providers that would suggest an inability to wear it."  (Tr. 16.)[5]  These findings are not supported by substantial evidence.

The evidence shows plaintiff to have experienced phantom limb pain since having her left arm amputated, as well as hypersensitivity and tenderness about the stump objectively observed by treating and consulting physicians.  This hypersensitivity and limb pain resulted in plaintiff foregoing the use of the prosthetic arm.  In addition, plaintiff's treating physician observed in February 2011 that, in addition to her reports of significant pain, plaintiff also had difficulty wearing the prosthetic arm because of the cumbersome nature of its harness on her body-type.  Indeed, recognizing the difficulty plaintiff had with the prosthesis, this treating physician referred plaintiff for additional surgery to reduce her breast size so that the harness may fit more comfortably.  It cannot be said that this recommendation for significant body-altering surgery to accommodate the

_____

[5] The ALJ refers to plaintiff being given a prosthetic arm "towards the end of 2011."  (Tr. 16.) The medical evidence shows plaintiff to have been provided a prosthetic arm in November 2010. The record contains no medical evidence of another prosthesis being provided.

prosthetic arm – with this recommendation being accompanied by a referral to a pain specialist – fails to suggest plaintiff's inability to wear the prosthesis.

Further, the ALJ's finding that plaintiff's related pain was controlled with medication is not supported by the record. To support this finding, the ALJ refers to an August 2010 note by Dr. Srivastava that plaintiff's pain was controlled with medication. (*See* Tr. 16, 284.) This notation was made, however, three weeks post-amputation while plaintiff continued to take Oxycodone, a narcotic analgesic used to relieve severe pain; and three months prior to plaintiff being fitted with a prosthetic arm and thus prior to plaintiff experiencing any pain relating to wearing the prosthesis. To the extent the ALJ also refers to Dr. Irvin's August 2011 treatment note that Neurontin helped with plaintiff's pain (*see* Tr. 16, 490), the undersigned notes that plaintiff nevertheless complained to Dr. Irvin at this appointment that she experienced arm pain and, indeed, plaintiff requested referral to a pain specialist the following month because of continued burning pain in her arm. Throughout the record, plaintiff continually complained to her treatment providers that she experienced significant pain. Other than her August 2011 statement to Dr. Irvin that Neurontin "helped" the pain, there is no indication in the record that plaintiff's pain was controlled after she received her prosthetic arm.

The ALJ also referred to plaintiff's failure to pursue referrals to physical therapy or to pain management services. (Tr. 16.) While a claimant's failure to

follow a recommended course of treatment may weigh against her credibility, *Gulliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005), it does not provide a basis upon which to deny disability unless the treatment will significantly improve the claimant's condition or restore her ability to work. *Kirby v. Sullivan*, 923 F.2d 1323, 1328 n.2 (8th Cir. 1991); *see also* 20 C.F.R. §§ 404.1530, 416.930. Neither has been shown here. Regardless, the record shows Dr. Cannada to have ultimately determined that referral to a pain specialist would be inappropriate given the nature of plaintiff's neuropathic pain. Further, the record shows that a prescription for physical therapy would be provided upon plaintiff being fit for prosthesis. The record is devoid, however, of any such prescription. Instead, plaintiff testified that she was provided with only a CD to help her learn to use the prosthesis. There is no substantial evidence of record that shows plaintiff failed to pursue recommended treatment.

In sum, a review of the record *in toto* shows that plaintiff suffers continual pain that renders her physically unable to use the prosthetic arm and also to suffer from emotional limitations that contribute to her inability to use the arm. There is no evidence to support the ALJ's RFC finding that plaintiff is able to use the arm as a "helper" arm in any regard. Because the hypothetical posed to the vocational expert contained this unsupported finding, the expert's testimony that plaintiff can perform work by using her dominant arm and this "helper" prosthetic arm cannot

constitute substantial evidence to support the ALJ's decision.  *Jones v. Astrue*, 619 F.3d 963, 972 (8th Cir. 2010).

In addition, plaintiff's argument that the ALJ erred by failing to enter the CDI Unit's surveillance video into evidence is well taken.  A review of the record and the ALJ's decision shows that the investigator's written report was entered into evidence.  The written report refers to the surveillance video as one of two exhibits to the report.  (*See* Tr. 244.)  Plaintiff avers, however, and the Commissioner does not dispute, that the video was not entered into evidence nor provided to plaintiff despite her request.  While an ALJ is permitted to consider a CDI report as third party observations of a claimant's functioning when determining the claimant's credibility, *see Phelps v. Astrue*, No. 4:11CV1362 MLM, 2012 WL 2885378, at *7 (E.D. Mo. July 13, 2012); *Byerly v. Astrue*, No. 1:09CV138 RWS/MLM, 2010 WL 4905510, at *7 (E.D. Mo. Oct. 29, 2010), the claimant must nevertheless be provided the opportunity to address the report.  *Robert v. Astrue*, 688 F. Supp. 2d 29, 37-38 (D. Mass. 2010).  Here, plaintiff had access to the written report but not the surveillance video, despite it being an exhibit to the report.  Without access to the full contents of the report, including its exhibits, it cannot be said that plaintiff here was provided an opportunity to fully address the report.  Upon remand, plaintiff shall be provided an opportunity to address the report in its entirety, including its exhibits, before the ALJ determines what weight to accord the report

in his determination of plaintiff's claims.

Finally, the ALJ did not err in according little weight to Dr. Moore's consulting opinion. As noted by the ALJ, Dr. Moore's opinion that plaintiff suffered marked mental limitations was inconsistent with the treatment notes of plaintiff's treating psychiatrist, Dr. Irvin, that consistently reported unremarkable mental status examinations, with plaintiff generally having a euthymic affect, a good mood, and reports of doing "great" in January 2012. It is the duty of the Commissioner to resolve conflicts in the medical evidence. *Renstrom v. Astrue,* 680 F.3d 1057, 1065 (8th Cir. 2012); *Spradling v. Chater*, 126 F.3d 1072, 1075 (8th Cir. 1997); *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995). Where a medical opinion is inconsistent with other substantial evidence, an ALJ does not err in discounting that opinion. *See Goff v. Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005).

## VII. Conclusion

For the reasons set out above on the claims raised by plaintiff, the final decision of the Commissioner is not supported by substantial evidence on the record as a whole. Upon remand, the Commissioner shall provide plaintiff the opportunity to address all of the evidence of record, including the CDI Unit's investigative report with exhibits. Upon providing plaintiff this opportunity, the Commissioner shall review all relevant medical and other evidence of record and

re-determine plaintiff's RFC.  Inasmuch as the determination of a claimant's RFC is a medical question and some medical evidence must support the determination, *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010), the Commissioner shall identify and clarify the medical evidence that supports her conclusions as to plaintiff's RFC.  The Commissioner is encouraged upon remand to obtain medical evidence that addresses plaintiff's ability to function in the workplace, which may include contacting her treating physician(s) to clarify her limitations and restrictions in order to ascertain what level of work, if any, she is able to perform. *See Coleman v. Astrue*, 498 F.3d 767 (8th Cir. 2007); *Smith v. Barnhart*, 435 F.3d 926, 930-31 (8th Cir. 2006).  If necessary, the Commissioner shall obtain additional vocational expert testimony to determine whether plaintiff is capable of performing other work as it exists in the national economy, and such testimony shall be based upon a proper hypothetical that accounts for all of plaintiff's limitations.

Because the current record does not conclusively demonstrate that plaintiff is entitled to benefits, it would be inappropriate for the Court to award plaintiff such benefits at this time.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further

proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 27th day of January, 2015.


_/s/ Nannette A. Baker_____
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE